## GALVESTON DRY DOCK & CONSTRUCTION CO. v. STANDARD DREDGING CO.

District Court, S. D. New York.
Sept. 18, 1934.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and Adrian J. O'Kane, both of New York City, of counsel), for libelant.

Bigham, Englar, Jones & Houston, of New York City (W. J. Nunnally, Jr., of New York City, of counsel), for respondent.

MACK, Circuit Judge.

Conceding libelant's claim for repairs, respondent sets off a claim for demurrage in the sum of $19,060.05 for delay of a fraction over eleven days caused by libelant's alleged negligence while the repairs were in progress.

At the trial, counsel for libelant made the following statement: "Libelant admits that respondent's dredge 'St. Hilda' became stuck and jammed on libelant's marine ways on Nov. 3rd, 1927 due to the fault of libelant; that by reason thereof there was some delay to respondent's dredge beyond the period that it otherwise would have taken to complete the repairs to said dredge which were then in progress; and that respondent is entitled to set-off against the amount of libelant's damages as alleged in the libel herein, some detention damages in respect of such dredge. Libelant does not concede, but denies, that the period of detention and the rate per day as claimed by respondent are correct."

Thereupon Judge Coleman referred the matter to a special commissioner "to determine the duration of the delay and the per diem rate at which compensation should be made to the respondent."

The following facts found by the commissioner are unchallenged: The St. Hilda put in libelant's dry dock early on the morning of October 24, 1927. Surveys made October 24 and 25 resulted in the ordering of various repairs which ultimately numbered 105 items. On November 3, after completion of repairs to its bottom, the dredge was to have been taken off the dry dock; thereafter, United States local inspectors were to have made a hydrostatic test of its boilers and uncompleted repairs were to have been finished. The dredge, in being taken off the dry dock at about 1 p. m. of November 3, was jammed on the ways and was not released and floated until 10 p. m. of November 13. Damage done by the jamming was surveyed November 14 and repaired that night. On November 15, the dredge was again floated, the inspectors tested the boilers, and issued their certificates. On the morning of November 16, the St. Hilda left libelant's yards.

Libelant challenges the commissioner's finding that if the dredge had not jammed on the ways, it would have been ready to leave the yards at about noon on November 5, and to his assessment and damages for eleven days' demurrage at the rate of $558.31 per day plus respondent's daily out of pocket expenses stipulated at $151.96 per day.

### 1. Detention Period.

Libelant urges that its concession means no more than that there was an infinitesimal period of detention, and that to this the doctrine of de minimis applies. The admission, deliberately made, in my judgment, clearly conceded in effect, a not unsubstantial detention. Libelant's original time sheets from which its cost account was compiled were destroyed after the present dispute arose. As the commissioner stated, if these daily time records had been preserved "the situa-

tion could be analyzed and greatly clarified." Without them, it is impossible to ascertain precisely how far the work had progressed and how much remained to be completed at the time the jamming occurred. However, from the various records that were produced together with testimony of witnesses, a sufficiently reliable approximation of the situation at that time can be made.

According to libelant's evidence which the commissioner accepted in this respect, at the time that the dredge jammed, work had been completed on 62 items and was in progress on some 42 other items that were ultimately completed. There is ample evidence that the work, unfinished when the jamming occurred, could and should have been completed, but for the jamming, at the latest by November 5.

Handley, who represented respondent at Galveston while the repairs were in progress, testified that Graves, libelant's general manager, assured him the day before the jamming that all repairs would be completed and the dredge ready to sail within two days from that time. Storch, the then master of the St. Hilda, testified that not only Graves but also Walters, libelant's superintendent, likewise assured him that the dredge would be ready to sail on November 4; further, that he himself felt that the work had gone forward rapidly enough so that they could sail on that date. Supplies were ordered and all arrangements made in accordance with this understanding.

The commissioner carefully questioned both Handley and Storch; he states in his report that he believes them. It is highly improbable that libelant's agents would have given such assurances unless the status of the work warranted them, especially since they must have known that arrangements for sailing would be made in reliance thereon. I concur entirely in the view taken by the commissioner with respect to this testimony.

Storch also testified that there was no work done on contract items except for a few on deck, between November 7 and November 15. Corroborative of this testimony is the St. Hilda's rough log, the master's daily record, in which it is noted that contract repairs were in progress up to and including November 7; after that date there are no such entries.

To discredit this testimony, libelant points to the fact that Storch ordered contract work stopped November 12 and then authorized its resumption November 15.

From this it is argued that contract work could not have ceased November 7. But the order to stop was given, as Storch explained, "because they were piddling around, had so many (repairmen) around that dredge, I was afraid they would charge us for all kinds of labor." Naturally he authorized resumption of work November 15, so that those items could be finished which were necessarily postponed until the dredge was off the dry dock. Those items could not be undertaken on the 14th, because on that day certain damage caused by the jamming was surveyed and repaired that night.

The commissioner found that during the time that the dredge was jammed, the contract work which was continued was unhurried and largely stalled. As he states, the repairmen probably lost the supervision of Graves, who must have been directing the strenuous efforts to release the dredge. Although they put in time, they were interested in that prospect, and dallied and fussed on the job.

These findings of the commissioner are amply supported by credible evidence. It is entirely reasonable to conclude that the St. Hilda would have sailed with all repairs completed at the latest by November 5, if no jamming had occurred. Perhaps it would have been necessary to put in overtime on November 3 and 4, but, as the commissioner implied in his report, libelant must have contemplated overtime work, if necessary.

Libelant urges that the parties could not have believed that the dredge would be near completion November 3, since the orders for work on 8 items and part of another were not yet issued on that day. I agree with the commissioner that of these items, Nos. 101, 103, and 104 must have been in the minds of the parties; actual orders were delayed because the items had to await the boiler inspection. Item 102 is merely an alteration in 101. Items 96, 97, 98, 99, and 105, and additions to 61 were either small additional jobs or work evidently ordered as the commissioner suggests, because of the enforced delay.

Libelant contends that it was improperly compelled to bear the burden of proof. The commissioner did state that the libelant had "failed in its proof to satisfy me that the items of work ordered could not in ordinary course have been finished on November 5." I believe, however, that the commissioner meant no more by this statement than that libelant had failed in its proof to meet the positive evidence introduced by respondent.

■ The foregoing is the statement of the reasons that led me to the conclusion announced to the counsel last year that the commissioner's finding that the delay caused to the St. Hilda, due to libelant's negligence in her jamming was eleven days, must be affirmed.

## 2. Amount of Damages.

■ While the rate per day, due to the detention, was stipulated by the parties, nevertheless the burden was on respondent to establish both that an actual loss had been suffered by the owner of the St. Hilda by reason of the detention, and the amount thereof. Brooklyn Eastern Dist. Terminal v. United States (1932) 287 U. S. 170, 53 S. Ct. 103, 77 L. Ed. 240; The Celtic (C. C. A. 2d, 1932) 56 F.(2d) 764.

Because, in my opinion, the case had been tried by respondent, and the commissioner's decision had been based on the theory that if detention had been proven, the stipulated per diem would necessarily be applicable, irrespective of proof of actual loss, the commissioner failed to make any finding as to the actual loss. The cause was, therefore, rereferred to the commissioner to hear arguments and to make findings on the following subject matter:

(1) If the St. Hilda had been at Tampico during the eleven days, would she during that time have been profitably engaged under the contract?

(2) In her absence did the Galveston, in addition to the work that she profitably performed, also do the profitable work that the St. Hilda would have done if she had been at Tampico? In other words, did the Galveston, by reason of her twenty-four hour work during this period, earn net what both vessels together would have earned if the St. Hilda had been present?

There was reserved for further consideration possible alternative methods for determining respondent's loss.

On the coming in of the report after argument, I announced its confirmation for the reasons given by the commissioner therein.

I adopt the commissioner's findings that the St. Hilda would have been profitably engaged under the contract during the eleven days delay for the reasons stated by him.

## 3. Costs.

I further announced at that time that the costs would be assessed against libelant.

The libel was originally filed for $26,112.43; the claim and the amount was conceded. But by way of set-off respondent claimed damages in the sum of $19,060.05 for the detention.

A decree for the difference was entered in favor of libelant; the suit was severed and continued for the balance of the claim as if it had been originally brought for the latter amount.

Thereupon an interlocutory decree was entered in favor of the libelant for that amount, $19,060.05, "together with interest and costs less the amount determined to be due to respondent" on the set-off with interest.

The result of this was that in the further proceedings respondent was called upon to prove its loss, if any, by reason of the detention and the amount thereof. It was as if respondent had brought the original action for this purpose, and as if libelant had denied all loss, and in addition, by way of counterclaim, had asked judgment for the amount admittedly due to it.

Respondent established its case under the set-off though not in the amount that it had claimed. Libelant, however, instead of conceding the full amount eventually found to be due from it on the set-off, asserted that respondent was entitled to no damage thereon. True it is that respondent's claim was for unliquidated damages and that it would have been difficult for libelant to have determined accurately, especially in the light of respondent's excessive demand, just what amount it should have conceded as a proper set-off to its admitted claim. If, however, it had conceded the amount now determined to be the proper one, respondent, as the loser of what then would have been the contest for a larger set-off, would properly have been chargeable with the costs.

■ In the circumstances, the costs of the proceedings subsequent to the interlocutory decree entered after the mandate from the Circuit Court of Appeals are properly chargeable against libelant.

This opinion may be taken as a statement of the findings of fact and conclusions of law pursuant to the rule. Decree may be submitted on two days' notice.